**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Martine MacDonald,<br><br>                        Plaintiff,<br><br>        -v-<br><br>County of Suffolk; Suffolk County Police Department; Brandon Rieber, *in his individual and official capacity as a police officer*; Jeff Michaels, *in his individual and official capacity as a police officer*; John Does 1–10, *in their individual and official capacities as police officers*,<br><br>                    Defendants. | 2:22-cv-188<br>(NJC) (AYS) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Martine MacDonald filed this action on January 12, 2022, bringing claims against the County of Suffolk (the "County"), the Suffolk County Police Department, and the following individual defendants, in their individual and official capacities as Suffolk County police officers: Brandon Rieber and Jeff Michaels (the "Defendant Officers"), as well as John Does 1–10. (Compl. ¶¶ 6–9, ECF No. 1.) The Complaint brings claims for racial discrimination under 42 U.S.C. § 1981 ("Section 1981") against the Defendant Officers and the County. (*Id*. at ¶¶ 95–101.) It also brings claims under 42 U.S.C. § 1983 ("Section 1983") to enforce rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution against the Defendant Officers and equal protection claims against the County under Section 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). (*Id*. ¶¶ 71–79 (*Monell* claim); *id*. ¶¶ 95–101 (claims against Defendant Officers).) The Complaint also brings claims under Section 1983 challenging false arrest, use of unreasonable force, abuse of process, malicious prosecution,

fabrication of evidence, and failure to intervene in violation of various rights protected by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, and claims under New York state law for negligence, false arrest, intentional infliction of emotional distress, and false imprisonment. (*Id*. ¶¶ 60–70, 80–94, 102–133.)

Before the Court is a Motion for Summary Judgment (the "Motion") by the County and Defendant Officers seeking summary judgment on all claims. (Mot., ECF No. 30.)[1] In his opposition brief, MacDonald withdrew his claims for false arrest, use of unreasonable force, malicious prosecution, fabrication of evidence, and failure to intervene under Section 1983 and various provisions of the U.S. Constitution, as well as his claims under New York law for false imprisonment, false arrest, and intentional infliction of emotional distress. (*See* Mem. in Opp. ECF No. 30-12 at 6 fn.1 and 8.) Further, MacDonald failed to oppose Defendants' arguments for summary judgment on the state law negligence claim and is therefore deemed to have abandoned that claim. *See Bryant v. Steele*, 462 F. Supp. 3d 249, 270 (E.D.N.Y. 2020) ("A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim.") *aff'd sub nom. Bryant v. Iheanacho*, 859 F. App'x 604 (2d Cir. 2021); *Williams v. Suffolk Cty.*, 284 F. Supp. 3d 275, 284 (E.D.N.Y. 2018) (applying this principle).

---

[1] Defendant Suffolk County Police Department has not moved for summary judgment or otherwise appeared in the action. It is well-establish that the Suffolk County Police Department is an administrative arm of Suffolk County and therefore lacks an independent legal identity such that it can be sued. *See Carthew v. Cnty. of Suffolk*, 709 F. Supp. 2d 188, 195 (E.D.N.Y. 2010) ("It is well settled that an entity such as the Suffolk County Police Department is an 'administrative arm' of the same municipal entity as Suffolk County and thus lacks the capacity to be sued."); *Brooks v. Suffolk Cnty. First Precinct*, No. 21-cv-4546, 2021 WL 5139075, at *2 (E.D.N.Y. Nov. 4, 2021) (holding that the Suffolk County Police Department First Precinct "is a non-suable entity because it is an administrative arm, which does not have a legal identity separate and apart from the municipality." (quoting *Spagnuolo v. Suffolk Cnty.*, No. 12-CV-4327, 2017 WL 4326510, at *2 (E.D.N.Y. Sept. 28, 2017))).

Finally, during the March 24, 2026 oral argument, MacDonald voluntarily withdrew his claims against Defendants under Section 1983 and the Fourteenth Amendment for abuse of process. (Apr. 24, 2026 Argument Tr. ("Tr.") at 5:15–16.) He also confirmed that he had previously withdrawn any claims under Section 1981 by letter and that any allegations in the Complaint supporting such claims were intended to support the Section 1983 equal protection claims. (*Id*. at 2:24–3:7; ECF No. 26 at 3.)

Remaining before me are Defendants' requests for summary judgment on MacDonald's racial discrimination claims under Section 1983 and the Fourteenth Amendment Equal Protection Clause. These consist of equal protection claims against the Defendant Officers on theories of intentional racial discrimination and selective enforcement, and against the County for municipal liability under *Monell*.

For the reasons explained below, numerous material questions of fact preclude a grant of summary judgment to Defendants on MacDonald's Section 1983 claims against the Defendant Officers for violation of his right to equal protection on a theory of intentional racial discrimination. Moreover, in light of these disputes of material fact, the Defendant Officers are not entitled to qualified immunity on MacDonald's equal protection claim at the summary judgment stage. However, Defendants have met their burden for summary judgment on MacDonald's Section 1983 claims against the Defendant Officers for violation of his right to equal protection on a selective prosecution theory and on his equal protection claims against Suffolk County under Section 1983 and *Monell* on a custom theory.

## BACKGROUND

On the evening of January 12, 2021, MacDonald was driving eastbound on Tulip Street in Greenlawn, New York, near the intersection of Tulip and Broadway Greenlawn. (*See*

3

Defendants' Rule 56.1 Statement in Opposition ("CSMF"), ECF No. 30-15 ¶¶ 2–3; Mot., Ex. B ("MacDonald Dep."), ECF No. 30-5 at 18:25–19:23.) At the same time, the Defendant Officers were driving southbound on Broadway, near the same intersection. (MacDonald Dep. at 16:22–17:12.) The Defendant Officers proceeded to turn left onto Tulip Street, bringing their vehicle parallel to MacDonald's, which was on the other side of the street. (*Id.*) MacDonald testified that he and Rieber made eye contact when the Defendant Officers turned onto Tulip Street (*id.* at 20:7–17), but Rieber disputes this and testified that he only observed MacDonald's vehicle, not MacDonald himself. (Mot., Ex. C ("Rieber Dep."), ECF No. 30-6 at 42:11–23.) After seeing Rieber, MacDonald feared that he would eventually be pulled over based on what other community members told him about Rieber's policing reputation. (MacDonald Dep. at 21:2–18; *id.* at 26:15–25.) As a result, he turned onto Stuyvesant Street, where some members of his family live a few blocks from his own home. (*Id.* at 21:6–18.) A few minutes later, the Defendant Officers approached by car and signaled to MacDonald to pull over near the intersection of Stuyvesant Street and Crown Avenue. (Opp'n, Ex. E ("SCPD Internal Affairs Report Part 1"), ECF No. 31-1 at 3, 6, 9.)

Rieber approached the driver's side of MacDonald's vehicle and asked MacDonald for his license and registration. (Rieber Dep. at 29:23–30:3.) MacDonald responded by asking Rieber for his name and the reason the officers had pulled him over, to which Rieber replied that MacDonald had failed to stop at a stop sign. (MacDonald Dep. at 33:8–15; Rieber Dep. at 30:18–21.) Upon hearing this, MacDonald told Rieber that he was lying. (MacDonald Dep. at 34:19–20.) At some point during the traffic stop, Rieber requested that additional police officers come to the scene, and eventually multiple police vehicles arrived. (SMF ¶ 16; SCPD Internal Affairs Report Part 1 at 3–4.) Rieber and Michaels testified in deposition that, as Rieber continued to ask

4

MacDonald questions, they observed that MacDonald's eyes were bloodshot and potentially jaundiced, and that MacDonald slurred at least one word when responding to Rieber. (Mot., Ex. D ("Michaels Dep."), ECF No. 30-7 at 20:11–21, 22:2–9; Rieber Dep. at 32:2–11.) As a result, Rieber suspected that MacDonald may have been intoxicated and asked him to step out of his vehicle so he could be tested for his sobriety. (Rieber Dep. at 32:1–11; *id*. at 36:11–15.) MacDonald initially refused to step out of the vehicle. (MacDonald Dep. at 36:6–9.) However, after observing that a number of additional police vehicles and personnel had arrived on the scene, MacDonald exited his vehicle. (*Id*. at 40:3–7.) Rieber informed MacDonald that he wanted to conduct a field sobriety test, and MacDonald repeatedly refused. (Rieber Dep. at 36:11–15.) Although Rieber never conducted the field sobriety test, as he continued to speak with MacDonald, he came to the conclusion that MacDonald was not intoxicated. (*Id*. at 36:15–16.)

At some point during the police stop, Michaels ran a check of MacDonald's license plate number, which yielded a bench-warrant for MacDonald's arrest that had been issued by Judge Swenson of the Suffolk County Third District Court. (Michaels Dep. at 22:18–25; Mot., Ex. H ("Warrant"), ECF No. 30-11.) The Defendant Officers arrested MacDonald pursuant to the bench warrant and transported him to the police precinct. (Rieber Dep. at 29:4–8; Michaels Dep. at 16:8–12.) At the police precinct, a supervising officer learned of MacDonald's arrest and ordered his release from custody because of his history working as a community liaison with the Suffolk County Police Department. (Michaels Dep. at 29:12–31:12.) MacDonald was released from police custody later that evening. (*Id*. at 30:6–14.) The Defendant Officers never issued MacDonald a summons, ticket, or warning for failure to stop at a stop sign. (Rieber Dep. at 52:8–15.)

## PROCEDURAL HISTORY

MacDonald filed the Complaint in this action on January 12, 2022. (Compl.) The Complaint brings forth the following claims against the Defendant Officers: (1) Section 1983 claims for false arrest, use of unreasonable force, abuse of process, malicious prosecution, fabrication of evidence, and failure to intervene, alleging violations of the Fourth, Fifth, Sixth, and Fourteenth Amendments; (2) a Section 1981 claim for racial discrimination; and (3) claims under New York law for negligence, false arrest, intentional affliction of emotional distress, and false imprisonment. (*See* Compl.) The Complaint also brings a claim under Section 1983 and *Monell* against the County for violation of MacDonald's rights to equal protection. (*Id*.)

The case was originally assigned to Judge Denis R. Hurley. (Elec. Order, Jan. 13, 2022.) On July 12, 2022, it was reassigned to Judge Diane Gujarati. (Elec. Order, Jul. 12, 2022.) Around one year later, on July 7, 2023, the case was reassigned to Judge Orelia E. Merchant. (Elec. Order, Jul. 7, 2023.) A few months later, on October 16, 2023, this action was reassigned to my docket, where it has remained. (Elec. Order, Oct. 16, 2023.)

On February 29, 2024, Defendants filed a letter seeking a pre-motion conference in anticipation of filing a motion for summary judgment. (ECF No. 25.) MacDonald filed a letter in opposition on March 8, 2024. (ECF No. 26.) In his opposition letter, MacDonald stated that his "§ 1981 claim is included in the § 1983 claim and is respectfully withdrawn" and that his "claims commenced under § 1981 are subsumed in the § 1983 claim[.]" (*Id*. at 3.) Furthermore, at oral argument, MacDonald conceded that he does not pursue any Section 1981 claims. (*See* Tr. 2:24–3:7.) As a result, I construe any allegations concerning Section 1981 claims for racial discrimination set forth in the Complaint as supporting MacDonald's Section 1983 claims to enforce his rights under the Fourteenth Amendment Equal Protection Clause. After reviewing the

6

parties' submissions, I waived Defendants' request for a pre-motion conference and set a briefing schedule on their anticipated motion for summary judgment. (Elec. Order, Apr. 24, 2024.)

Pursuant to the briefing schedule and the Court's recommended bundling practice, the parties filed their submissions on Defendants' Motion for Summary Judgment on July 12, 2024. (Not. Mot., ECF No. 30-1; Mem. Supp. Mot. Summ. J. ("Mot."), ECF No. 30-12; Mem. L. Opp'n Defs'. Mot. Summ. J. ("Opp'n"), ECF No. 30-14; Reply Mem. Supp. Defs'. Mot. Summ. J. ("Reply"), ECF No. 30-25.)

Along with their Motion, Defendants filed a Rule 56.1 Statement of Material Facts ("SMF") (SMF, ECF No. 30-2), the declaration of their counsel, Callan W. Tauster, and the following attached exhibits:

- the operative Complaint (ECF No. 30-4);

- transcripts of the depositions of MacDonald (MacDonald Dep.); Rieber (Rieber Dep.); and Michaels (Michaels Dep.);

- a redacted Arrest Report issued by the Suffolk County Police Department detailing MacDonald's arrest on January 12, 2021 (("Arrest Report"), ECF No. 30-8);

- a redacted Suffolk County Police Department Prisoner Activity Log, dated January 12, 2021 (ECF No. 30-9);

- a redacted Suffolk County District Court Certification of Order Vacating District Court Warrant(s), dated January 13, 2021 (ECF No. 30-10); and

- a redacted copy of the bench warrant seeking MacDonald's arrest issued by Judge Swenson of the Suffolk County Third District Court, dated July 24, 2019 (("Bench Warrant"), ECF No. 30-11).

MacDonald filed a brief in opposition, along with a declaration from his counsel Cobia Powell (ECF No. 30-16), a Rule 56.1 Statement of Disputed Facts and Counterstatement of Facts (("CSMF"), ECF No. 30-15), and the following attached exhibits:

7

- the operative Complaint (ECF No. 30-17);

- transcripts of the depositions of MacDonald (ECF No. 30-18), Defendant Rieber (ECF No. 30-19), and Defendant Michaels (ECF No. 30-20);

- copies of Suffolk County Police Department Internal Correspondence regarding Internal Affairs Bureau Cause # 21-176i, which pertains to MacDonald's Notice of Claim and lawsuit against Defendants ("SCPD Internal Affairs Report Part 1"), ECF No. 31-1; ("SCPD Internal Affairs Report Part 2"), ECF No. 31-2; ("SCPD Internal Affairs Report Part 3"), ECF No. 31-3; ("SCPD Internal Affairs Report Part 4"), ECF No. 31-4); and

- video footage documenting the interactions between MacDonald, Rieber, and Michaels after the Defendant Officers pulled MacDonald over on January 12, 2021 (ECF Nos. 30-22–30-24).[2]

Defendants filed a reply in support of their Motion for Summary Judgment, a second declaration from Tauster (ECF No. 30-26), and the following attached exhibits:

- a copy of MacDonald's requests for discovery pursuant to Rule 34 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") (ECF No. 30-27); and

- a copy of Defendants' response to MacDonald's Rule 34 request (ECF NO. 30-28).

Defendants' Motion is therefore fully briefed.

Following the close of briefing, I heard argument on the Motion on March 7, 2025, and referred the case to mediation. (Min. Entry, Mar. 7, 2025; Elec. Order, Mar. 7, 2025.) On March 14, 2025, Defendants filed a motion, with MacDonald's consent, requesting a settlement conference. (ECF No. 34.) On March 31, 2025, the parties participated in a settlement conference in front of Magistrate Judge Anne Y. Shields but were unable to resolve the action. (ECF No. 36.) As such, Defendants' Motion is therefore ripe for review.

---

[2] MacDonald sent the Court a copy of the video footage on a USB flash drive.

8

On April 24, 2026, I heard additional argument on the Motion, during which MacDonald voluntarily withdrew the Section 1983 abuse of process claim, as noted above. (Min. Entry, Apr. 24, 2026.) MacDonald also conceded during argument that he pursues the equal protection claim against Suffolk County under Section 1983 and *Monell* under only a custom theory, and not other theories, such as failure to train or failure to supervise. (Tr. at 39:23–40:5.) Accordingly, the only claims remaining in this action are MacDonald's equal protection claims under Section 1983 against Rieber and Michaels under theories of intentional discrimination and selective prosecution and equal protection claims against Suffolk County for municipal liability under Section 1983 and *Monell* on a custom theory.

### JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the Complaint alleges violations of federal law under 42 U.S.C. § 1983. (Compl. ¶ 4.). Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b)(2) because the Complaint alleges that a substantial part of the events that gave rise to MacDonald's claims occurred in this District. (Compl. ¶ 5.)

### LEGAL STANDARDS

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107 (2d Cir. 2017) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).[3] "A fact is material if it 'might affect the outcome of

---

[3] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

the suit under the governing law.'" *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023), *rev'd on other grounds*, 604 U.S. 693 (2025) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of "material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In order to defeat summary judgment, the non-moving party must set forth sufficient facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c). Under this standard, if the movant meets its burden, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial" in order to avoid summary judgment. *McKinney v. City of Middletown*, 49 F.4th 730, 745–46 (2d Cir. 2022) (quoting *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 124 (2d Cir. 2013)). The non-moving party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019); *see also Daly v. Westchester Cnty. Bd. of Legislators*, No. 23-cv-1220, 2024 WL 3264125, at *2 (2d Cir. July 2, 2024) (summary order). Nor may it rely on "conclusory statements or mere allegations . . . ." *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024).

A court considering whether summary judgment is appropriate "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Cunningham*, 86 F.4th at 980; *see also Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 939 (2d Cir. 2024) ("We may find for the movant defendant only if we conclude that on the record presented, considered in the light most favorable to the non-movant plaintiff, no reasonable jury could find in the plaintiff's favor."). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a

10

material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983); *see also Jones v. City of New York*, 603 Fed. App'x. 13, 14 (2d Cir. 2014) (holding that summary judgment must be denied "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## DISCUSSION

As noted, the sole remaining claims in the case are MacDonald's equal protection claims under Section 1983 against Rieber and Michaels under theories of intentional discrimination and selective prosecution and his equal protection claims against Suffolk County for municipal liability under Section 1983 and *Monell* on a custom theory.

Defendants move for summary judgment on MacDonald's equal protection claims, arguing that "[t]here is no evidence that Plaintiff was the victim of biased policing, other than his own conclusory allegations" and hearsay statements from two individuals who were never deposed and never submitted affidavits supporting their assertions. (Mot. at 16.) Defendants also rely on Rieber's deposition testimony to assert that Rieber did not know MacDonald's race prior to pulling him over and therefore could not have stopped him on the basis of his race. (*Id*.)

In opposition, MacDonald argues that his deposition testimony creates a question of material fact as to whether Rieber knew MacDonald's race prior to pulling him over, as MacDonald testified that he and Rieber made eye contact prior to the traffic stop. (Opp'n at 5.) Further, MacDonald argues that the traffic stop itself was pretextual because he did not violate any traffic laws, despite the Defendant Officers' claim that they stopped him for failing to stop at a stop sign. (*See id*. at 5–7.)

For the reasons set forth below, the record gives rise to numerous questions of material fact pertaining to whether the Defendant Officers' decision to subject MacDonald to a traffic

11

stop was motivated by MacDonald's race, rather than a genuine effort to enforce traffic laws. Thus, MacDonald's equal protection claims based on a theory of intentional racial discrimination survive summary judgment. However, MacDonald's equal protection claims against the Defendant Officers on a selective enforcement theory do not survive summary judgment because MacDonald has failed to identify any arguably similarly situated individual of a different race who was treated differently.

Further, in light of the genuine disputes of material fact regarding whether the Defendant Officers' decision to subject MacDonald to a traffic stop was motivated by his race, the Defendant Officers are not entitled to qualified immunity at the summary judgment stage. Indeed, during oral argument, Defendants conceded this point.

Although Defendants did not move for summary judgment on MacDonald's claims against Suffolk County for municipal liability under Section 1983 and *Monell*, MacDonald himself raised these claims in his opposition to Defendants' Motion. (*See* Opp'n at 10–12.) There, MacDonald argues that Rieber has a reputation for subjecting Black motorists to traffic stops solely on the basis of their race and has never been disciplined by the County for this practice, which supports the existence of an alleged, de facto Suffolk County policy or custom by which police subject Black motorists to unlawful traffic stops. (*Id*. at 11.) On reply, Defendants contend that MacDonald's argument relies solely on inadmissible hearsay, and that he has thus failed to identify any admissible evidence in the record giving rise to a genuine dispute of material fact as to whether the County has a policy, custom, or practice of biased policing. (Reply at 7.) Although it is unclear under which equal protection theory MacDonald seeks to advance his *Monell* claim, I need not reach this issue because MacDonald pursues these claims solely on a custom theory but has not identified any evidence in the record to support a genuine

12

dispute of material fact as to whether the County has a widespread custom of subjecting Black motorists to unlawful traffic stops. Accordingly, Defendants' motion for summary judgment is granted on MacDonald's *Monell* claim.

## I.    Legal Standards for Equal Protection Claims Under Section 1983

The Fourteenth Amendment Equal Protection Clause prohibits states from "deny[ing] to any person within [their] jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Its "central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race." *Chinese Am. Citizens All. of Greater New York v. Adams*, 116 F.4th 161, 170 (2d Cir. 2024) (quoting *Shaw v. Reno*, 509 U.S. 630, 642 (1993)). As such, "the Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

"To prove a violation of the Equal Protection Clause, for example, a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). There are three types of equal protection claims, which are partially overlapping: (1) intentional discrimination; (2) selective enforcement; and (3) class of one. *Randolph v. DOCCS*, No. 17-cv-0700, 2018 WL 4374006, at *5 (S.D.N.Y. Sept. 13, 2018). As for the first type of claim, intentional discrimination may be shown through: (1) "a facially discriminatory law"; (2) "a facially neutral statute that was adopted with a discriminatory intent and applied with a discriminatory effect"; and (3) "a facially neutral law that is enforced in a discriminatory manner." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, NY, 945 F.3d 83, 111 (2d Cir. 2019).

13

A "plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals." *Pyke v. Cuomo*, 258 F.3d 107, 108–09 (2d Cir. 2001). Instead, under these two theories of intentional discrimination, a plaintiff will "be required to substantiate their claim that the [challenged action] was motivated by racial discrimination." *Id*. at 110; *see also Indig v. Vill. of Pomona*, No. 18-cv-010204, 2024 WL 4008231, at *9 (S.D.N.Y. Aug. 30, 2024) (holding that a plaintiff who "alleges that a facially neutral law or policy has been applied in an intentionally discriminatory manner . . . must demonstrate that the application of the law was motivated by discrimination"). Moreover, a plaintiff bringing an intentional discrimination claim must show that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979); *see also Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010) (same); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 662 (S.D.N.Y. 2013) ("To establish discriminatory intent, plaintiffs must show that those responsible for the profiling did so at least in part 'because of,' not merely 'in spite of,' its adverse effects upon the profiled racial groups.").

Nevertheless, in the context of an equal protection claim premised on any of the intentional discrimination theories, a "plaintiff need not prove that the challenged action rested *solely* on racially discriminatory purposes." *Hayden*, 594 F.3d at 163 (emphasis added). Rather, a plaintiff need only to show "that race was a motivating factor." *United States v. City of Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996); *see also Louis v. Metro. Transit Auth.*, 145 F. Supp. 3d 215, 226

(E.D.N.Y. 2015) (recognizing that a plaintiff needs to "only show that the alleged discrimination was a 'substantial or motivating factor' for the . . . action").

Discriminatory motivation may be proven by "circumstantial or direct evidence, including, for example, the historical background of the challenged decision, antecedent events, departures from normal procedures, and contemporary statements by decisionmakers." *Louis*, 145 F. Supp. 3d at 226. However, "a non-moving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment" *Adler v. Penn Credit Corp.*, No. 19-cv-7084, 2022 WL 744031, at *9 (S.D.N.Y. Mar. 11, 2022). Similarly, "secondhand allegations are insufficient to establish intentional discrimination where there is no evidence directly connecting" the discriminatory allegations with defendants' action against plaintiffs. *Indig*, No. 18-cv-10204, 2024 WL 4008231, at *11. As such, to prove an equal protection violation, a plaintiff "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *see also Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 166 (2d Cir. 2001) (same).

On the other hand, to prevail on an equal protection claim under a theory of selective prosecution, a plaintiff must prove that: (1) "compared to others similarly situated, [he or she] was selectively treated," and (2) "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019). "[A] plaintiff alleging a claim of selective prosecution in violation of the Equal Protection Clause *must plead and establish* the existence of similarly situated individuals who were not prosecuted . . . because courts grant special deference to the executive branch in the performance of the core executive function of deciding whether to prosecute." *Pyke*, 258

15

F.3d at 109. Thus, to prevail on a selective prosecution theory, the plaintiff "must identify [at least one] similarly situated" individual who does not share plaintiff's race and who serves as a comparator. *Savino v. Town of Se.*, 983 F. Supp. 2d 293, 305 (S.D.N.Y. 2013), *aff'd*, 572 F. App'x 15 (2d Cir. 2014). "Similarly situated" does not mean identical, but rather "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).[4] Indeed, a plaintiff pursuing an equal protection claim on a selective prosecution theory "must identify comparators whom a prudent person would think were roughly equivalent." *Abel v. Morabito*, No. 04-cv-07284, 2009 WL 321007 (S.D.N.Y. Feb. 10, 2009).

MacDonald pursues equal protection claims for racial discrimination under two separate theories: (1) selective prosecution, and (2) intentional discrimination based on a discriminatory application of facially neutral traffic laws. Defendants seek summary judgment on both theories.

## II.     Selective Enforcement

Defendants argue for summary judgment on MacDonald's equal protection claims against the Defendant Officers, arguing that the factual record does not support a finding of biased policing and that Rieber did not know MacDonald's race prior to pulling him over. (Mot. at 15–16.) In opposition to the Motion, MacDonald argues the undisputed proposition that the "Constitution prohibits selective enforcement of the law based on considerations such as race." (Opp'n at 4–5 (citing *Whren*, 517 U.S. at 813).)

---

[4] Although *Graham*'s articulation of the standards for determining whether an individual is "similarly situated" was made in the context of a Title VII claim, the Second Circuit has since used this standard "in a variety of contexts," including in the equal protection context, "to determine whether a plaintiff's disparate treatment raises an inference of discrimination." *Hu*, 927 F.3d at 96 (2d Cir. 2019).

16

MacDonald's equal protection claims premised on a selective enforcement theory fail as a matter of law because MacDonald does not identify *any* similarly situated person of a different race who arguably serves as a comparator for an assessment of whether Defendants selectively enforced the law against him. Indeed, nowhere in the Complaint or MacDonald's opposition submissions is there any mention of a comparator. (*See generally* Compl.; Opp'n.) Similarly, MacDonald's counsel could not identify any similarly situated person compared to whom MacDonald was selectively treated when asked to do so during oral argument. (*See* Tr. at 10:8–13:5 (MacDonald's counsel stating, "I don't think there is [a comparator] in the record outside of Mr. MacDonald's testimony going against the officer's testimony")).)

Rather, in opposition to Defendants' summary judgment motion on the equal protection claims brought under a selective enforcement theory, MacDonald relies only on his own testimony that he did not fail to stop at a stop sign and that the Defendant Officers' purported enforcement of traffic laws was pretext for racial discrimination. (Opp'n 4–7.) While pertinent to the determination of whether MacDonald's equal protection claims pursued on an intentional racial discrimination theory survive summary judgment, this argument, and MacDonald's opposition submissions as a whole, fail to raise a material question of fact as to whether Defendants selectively treated MacDonald in subjecting him to a traffic stop when "compared to others similarly situated . . . ." *Hu*, 927 F.3d at 91. Accordingly, MacDonald's equal protection claims on a selective enforcement theory do not survive Defendants' summary judgment motion. *See, e.g. Gonzalez v. City of New York*, No. 99-cv-9128, 2000 WL 1678036, at *4 (S.D.N.Y. Nov. 8, 2000), *aff'd*, 38 F. App'x 62 (2d Cir. 2002) (granting summary judgment to Defendants because "the mere fact that [non-white Plaintiffs] were stopped by white police officers does not constitute evidence of selective enforcement"); *McDaniels v. Mertens*, No. 3:21-cv-441, 2022

17

WL 356738, at *3 (N.D.N.Y. Feb. 7, 2022), *aff'd*, No. 22-451, 2023 WL 5662751 (2d Cir. Sept. 1, 2023) ("The failure to allege a comparator requires the dismissal of Plaintiff's [equal protection] claim.").

### III.     Intentional Discrimination

The Complaint also pleads equal protection claims against Defendants on the basis of an intentional racial discrimination theory. Of the three iterations of such claims, the factual allegations of the Complaint allege that MacDonald was subject to intentional racial discrimination through Defendants' enforcement of a facially neutral law—the traffic law requiring motorists to stop at a stop sign—in a discriminatory manner. *See Congregation Rabbinical Coll. of Tartikov, Inc.*, 945 F.3d 83, 111 (2d Cir. 2019).

Although there is "overlap" between an equal protection claim based on the discriminatory application of a facially neutral policy and an equal protection claim based on a selective enforcement theory, the "chief difference" is that the latter theory requires a plaintiff to "identify comparators" whereas the former does not. *Chinese Am. Citizens All. of Greater New York*, 2025 WL 2753551 at *30; *see also White v. City of New York*, 206 F. Supp. 3d 920, 930 (S.D.N.Y. 2016) (same). Moreover, to demonstrate an equal protection violation on the basis of the discriminatory application of a facially neutral law, the plaintiff must show that the application of the law was motivated, at least in part, by discrimination. *See Pyke*, 258 F.3d at 108–09; *see also Chinese Am. Citizens All. of Greater New York*, 802 F. Supp. 3d at 531 (same); *Feeney*, 442 U.S. at 279 (holding that a plaintiff must show that "the decisionmaker . . . selected or reaffirmed a particular course of action *at least in part* 'because of,' . . . its adverse effects on an identifiable group").

18

Defendants make three arguments in moving for summary judgment on MacDonald's equal protection claims premised on an intentional race discrimination theory. First, they argue that "there is no evidence that Plaintiff was the victim of biased policing, other than his own conclusory allegations." (Mot. at 16.) Defendants contend that MacDonald cites only to allegations in the Complaint, rather than evidence in the record to support the assertion in his Rule 56.1 Counterstatement of Material Facts that he "was pulled over due to race pretext." (Reply at 4–5 (citing CSMF ¶ 26).) Second, Defendants argue that MacDonald "baselessly asserted that Defendant Rieber has a reputation in the black community for biased policing," but "presents no evidence other than hearsay statements from two individuals" who were not deposed and who did provide any sworn statements to support MacDonald's claims. (Mot. at 16.) Third, Defendants argue that MacDonald lacks evidence for his equal protection claims because it is undisputed that the Defendant Officers did not engage in any name-calling or use any racial slurs during their interactions with him. (*Id.* (citing SMF ¶ 51); s*ee also* MacDonald Dep. at 76:23 ("No name calling, no. No racial slurs, no.").)

In opposition, MacDonald argues that he was driving lawfully when the Defendant Officers pulled him over, which gives rise to a material question of fact as to whether the Defendant Officers' assertion that he had failed to stop at a stop sign was pretext for racial profiling. (Opp'n at 5.) MacDonald further argues that the Defendant Officers' post-stop conduct—including Rieber's accusation that MacDonald was intoxicated, which Rieber subsequently withdrew, and the fact that the Defendant Officers never gave MacDonald a ticket or warning for failing a stop at a stop sign—raise material questions of fact as to whether the Defendant Officers stopped him because of his Black race. (*Id*. at 5–7.)

19

MacDonald seeks to rely on hearsay statements regarding Rieber's reputation in the Black community to raise a material question of fact as to whether the Defendant Officers' decision to subject MacDonald to a traffic stop was racially motivated. During his deposition, MacDonald testified that "people have specifically come to me as well as other community leaders and expressed complaints about Officer Rieber. I myself have taken those complaints to the inspector in community meetings." (MacDonald Dep. at 26:17–21.) He added that community members would complain to him that Officer Rieber "would violate their rights, pull them over for no reason, shake them down, pull them over in the hopes of finding something, a law being broken," and listed the names of two particular individuals whom he asserts approached him with such complaints. (*Id.* 27:3–25.)

However, MacDonald has not shown that these vague references to out-of-court complaints from two individuals and otherwise unnamed community members are admissible at trial. It is well-established in the Second Circuit that "a party 'cannot rely on inadmissible hearsay in opposing a motion for summary judgment absent a showing that admissible evidence will be available at trial." *Wekenmann v. Biegasiewicz*, No. 24-1181, 2025 WL 831201, at *3 (2d Cir. Mar. 17, 2025) (summary order) (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)). In *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 222 (2d Cir. 2004), the Second Circuit held that hearsay statements that were "neither reaffirmed in an affidavit [by the declarant] stating, for example, that he would give the same testimony at trial" nor supported by any showing that the statements would be otherwise admissible at trial could not be considered on a motion for summary judgment. Here, MacDonald has not identified any admissible evidence concerning complaints that Rieber has a history of biased policing, whether in the form of deposition testimony, affidavits, or other sworn

20

statements. *See Weinberg v. Vill. of Clayton, New York*, No. 5:17-cv-00021, 2018 WL 5777292, at *3 (N.D.N.Y. Nov. 2, 2018) (holding that "the Court cannot infer . . . animus based on speculative opinions of community members.") As such, MacDonald's testimony regarding the complaints of two community members about Rieber and vague allusions to other complaints does not give rise to a genuine dispute of material fact as to whether race was a substantial or motivating factor in Rieber's decision to subject MacDonald to a traffic stop.

Nonetheless, the record gives rise to numerous, genuine disputes of material fact regarding whether the Defendant Officers' traffic stop of MacDonald was motivated by race. In their depositions, Rieber and Michaels both testified that they pulled MacDonald over because he failed to stop at a stop sign. (Rieber Dep. at 30:18–20; Michaels Dep. at 19:8–11.) MacDonald, on the other hand, disputes the Defendant Officers' testimony and testified he did not fail to stop at any stop sign. (*See* MacDonald Dep. at 35:2–16.) He further testified that he was "aware that [no traffic violation] occurred" and that he was "cautious about not going over the speed limit," "cautious about using his signals," and that "anything that could be used against him, [he] was aware of not doing." (*Id*. 23:13–16.) According to MacDonald, after he was pulled over, he immediately told Rieber that Rieber was lying when he stated that MacDonald failed to stop at a stop sign. (MacDonald Dep. at 34:19–20 ("Then he gave [the reason] to me and I told him he was lying. I told him he was being untruthful."); *id*. at 36:2–3 ("I told him he was lying").) This contradictory testimony gives rise to numerous genuine disputes regarding facts of consequence at trial, including whether the Defendant Officers had reasonable suspicion that MacDonald had failed to stop at a stop sign before they pulled him over and whether the Defendant Officers used traffic enforcement as a pretext to stop MacDonald because of his race. *See Reyes-Herrera v. Flaitz*, 539 F. Supp. 3d 290, 304 (W.D.N.Y. 2021) (denying summary

judgment where conflicting deposition testimony from defendant police officers and the plaintiff "would require the Court to resolve disputed issues of fact in favor of Defendants, in complete contravention of the standard to be applied on a motion for summary judgment").

Moreover, the record also features genuine disputes of material fact as to whether the Defendant Officers were aware of MacDonald's race prior to pulling him over. MacDonald testified that he and Rieber made eye contact while driving past each other. (*See* MacDonald Dep. at 17:2–4 ("That vehicle proceeded—at that point myself and the officer in this vehicle looked at each other."); *id*. at 20:9–11 ("The police car made a right onto Tulip. I looked at him. He looked at me."); *id*. 18:25–3 ("So, it wasn't until the point where we are parallel on Tulip that I looked and understood who he was.").) By contrast, Rieber testified that he did not see who was driving the vehicle or observe the driver's race prior to conducting the traffic stop. (*See* Rieber Dep. at 40:6–21; *id*. at 42:14 ("I observed the vehicle [not the driver]."); *id*. at 42:24–43:3 (answering "Yes" to the question of whether it would be accurate to say that he never made eye contact with MacDonald prior to pulling him over). The parties' conflicting accounts of precisely what transpired in the lead up to the traffic stop raise several genuine disputes of material fact that foreclose summary judgment for the Defendant Officers on MacDonald's equal protection claims. *See Reyes-Herrera*, 539 F. Supp. 3d at 304; *Ali v. Connick*, 136 F. Supp. 3d 270, 280 (E.D.N.Y. 2015) ("Defendants deny that Plaintiff was subjected to any racial slurs or physical abuse, but this is typically the type of credibility determination that must be left to a jury."); *cf. Davis v. City of Seattle*, No. 13-cv-0895, 2014 WL 3810574, at *9 (W.D. Wash. Aug. 1, 2014) (granting summary judgment for Defendants despite the parties' dispute about whether the officers were aware of plaintiff's race prior to the traffic stop where *plaintiff's traffic violation itself* was undisputed).

22

Moreover, facts in the record regarding the Suffolk County Police Department Internal Affairs Bureau's investigation into the traffic stop contribute to the existence of genuine disputes of material fact as to whether the Defendant Officers' proffered reasons for stopping MacDonald—the neutral enforcement of traffic laws—was pretext for stopping him on the basis of his race. The investigation report details that "both Rieber and Michaels were initially unsure about the exact location where MacDonald disobeyed the stop sign. They were also unsure about how they managed to get behind MacDonald's vehicle prior to stopping him." (SCPD Internal Affairs Report Part 1 at 11.) The investigation report also recognizes that the Defendant Officers' inability to identify exactly where MacDonald allegedly failed to stop is unusual: "While officers cannot be expected to remember every detail of every traffic stop, it would be reasonable to expect [the Defendant Officers] to remember the location and circumstances surrounding a confrontational stop, such as the one in this case." (*Id*.) Accordingly, the contradictions between MacDonald's testimony and that of the Defendant Offices regarding the parties' conduct leading up to the traffic stop along with the findings of the Suffolk County Police Department Internal Affairs Bureau that the Defendant Officers were unable to recall the location or circumstances of the traffic stop and that such an inability to recall is unusual all contribute to the existence of genuine disputes of material fact regarding whether the Defendant Officers' enforcement of traffic laws was a pretext for stopping MacDonald on the basis of his race.

Accordingly, MacDonald's Section 1983 equal protection claims brought on an intentional discrimination theory survives Defendants' motion for summary judgment.

### IV.    Qualified Immunity

The Defendant Officers argue that they are entitled to qualified immunity with respect to MacDonald's Section 1983 claims. (Mot. at 19–20.) "A decision dismissing a claim based on

qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011)).

However, here where there are numerous genuine disputes of material fact as to whether the Defendant Officers intentionally discriminated against MacDonald on the basis of his race by subjecting him to a traffic stop, the Defendant Officers have not shown that no rational jury could conclude that they violated MacDonald's right to equal protection of the laws. Accordingly, their qualified immunity argument is premature and cannot be resolved on summary judgment. *See Dufort v. City of New York*, 874 F.3d 338, 343 (2d Cir. 2017) (reversing the district court's grant of summary judgment on plaintiff's false arrest and malicious prosecution claims as "premature" due to disputed questions of material fact as to whether there was a constitutional violation). At oral argument, Defendants conceded this point. (*See* Tr. 44:2–7 ("Assuming that the court finds there is a question of fact in terms of the basis of the stop, then qualified immunity may be later for the jury. I don't know that it would really be necessary at this point now depending on if that threshold question is answered.").)

Accordingly, Defendants' motion for summary judgment on qualified immunity grounds is denied.

## V.    *Monell* Claim

Defendants did not move for summary judgment on MacDonald's equal protection claims against Suffolk County under Section 1983 and *Monell* in the opening brief in support of their Motion. Rather, MacDonald raised his *Monell* claim in opposition, and Defendants

responded on reply. "Arguments newly raised in reply briefs generally are not considered because the opposing party may not have an adequate opportunity to respond. However, the Second Circuit has made clear that district courts have discretion to consider a belatedly raised argument, and a judge's decision to countenance such an argument is reviewed only for abuse of discretion." *Escobar v. Correa*, No. 22-cv-08434, 2024 WL 4042122, at *5 (S.D.N.Y. Sept. 4, 2024) (citing *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005)); *see also Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venez.*, 341 F. App'x 722, 724 (2d Cir. 2009) ("A district court enjoys broad discretion . . . to consider arguments made for the first time in a reply brief."). Accordingly, although Defendants failed to address the *Monell* claims in their opening brief in support of their Motion for Summary Judgment, I consider their arguments raised in reply given that MacDonald has had an adequate opportunity to be heard on this issue by raising these claims in his opposition and by addressing them during oral argument.

In *Monell v. Department of Social Services*, the Supreme Court established that "municipalities and other local government units" are "persons" who may be liable under Section 1983. 436 U.S. at 690. Still, "a municipality cannot be held liable under [Section] 1983 on a respondeat superior theory." *Id*. at 691. In other words, the plaintiff must show that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020). Accordingly, in order to bring a *Monell* claim against a municipality or other local government unit, the plaintiff must allege facts supporting: "(1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023). A plaintiff may establish the existence of a municipal policy giving rise to Monell liability in four different ways:

(1) a formal policy endorsed by the municipality . . . ; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy . . . ; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware . . . ; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees.

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589–90 (2d Cir. 2019); *see also Savarese v. City*

*of New York*, 547 F. Supp. 3d 305, 354 (S.D.N.Y. 2021).

The Complaint appears to allege several different theories in support of the claims against

Suffolk County under Section 1983 and *Monell* through the following allegations:

(1) that the County "has permitted and tolerated a pattern and practice of unjustified, unreasonable and illegal abuses and arrests of Black persons by police officers of the County of Suffolk" (Compl. ¶ 72);

(2) that "the County has "failed to maintain a proper system for investigation of all incidents of unjustified arrests, improper detentions, beatings and excessive use of force by police officers" (*id*. ¶ 73);

(3) that the County has "failed to respond to the continuing and urgent need to prevent, retrain and discipline police officers who deprive civil rights of, and abuse, minorities" (*id*. ¶ 74);

(4) that the County has "failed to properly review unjustified behavior and excessive use of force by police officers" (*id*. ¶ 75); and

(5) that the County "has failed to identify the improper abuse, misuse, violative acts and brutality by police officers and subject officers who lie, mistreat, violate rights, and beat/brutalize to discipline, closer supervision or restraint to the extent that it has become the custom of the County to tolerate improper beatings, illegal arrests by police officers" (*id*.).

However, in opposition to Defendants' Motion, MacDonald only argues that the County "has a

de facto *policy* of targeting, harassing and pulling over Black individuals through *Terry* stops."

(Opp'n at 11 (emphasis added).)

When questioned at oral argument about the claims against Suffolk County under Section

1983 and *Monell*, MacDonald's counsel clarified that these claims are based solely on the theory

that Suffolk County has a widespread practice and custom by which police officers subject Black

26

motorists to *Terry* stops on the basis of their race. (Min. Entry, Apr. 24, 2026; Tr. at 39:24–40:5.) Accordingly, I evaluate whether Defendants have met their burden to secure summary judgment on MacDonald's claims against Suffolk County, which are brought on a custom theory.

In order to prove *Monell* liability based on a custom theory, the plaintiff must establish "an unwritten practice that is so widespread as to have the force of law." *Agosto*, 982 F.3d at 98. Such a theory does not require "an express rule or regulation that embodies the alleged unconstitutional practice among subordinate municipal employees." *Hu*, 927 F.3d at 106. However, the plaintiff must show a "practice by a subordinate municipal employee (or employees) other than a policymaker" that is "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Lucente v. Cnty. of Suffolk*, 980 F.2d 284, 297–98 (2d Cir. 2020). In other words, there must be a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also Tieman v. City of Newburgh*, No. 13-cv-4178, 2015 WL 1379652, at *16 (S.D.N.Y. Mar. 26, 2015). Under this standard, "instances of reprehensible and at times illegal and unconstitutional conduct by individual [government officials]" are not enough absent evidence that such conduct was "so *widespread* as to support an inference that it must have been known and tolerated by supervisors." *Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012) (emphasis added).

For example, in considering a *Monell* claim against the East Haven Police Department for an alleged custom of discriminatory police abuse in *Jones*, the Second Circuit held that "two instances [of unlawful conduct], or at the most three, over a period of several years, in which a small number of officers abused the rights of [B]lack people" fell short of establishing conduct "so persistent" as to constitute a custom. *Id.* at 85. Likewise, in *Hu*, the Second Circuit affirmed

27

the dismissal of a *Monell* claim alleging a custom of discriminatory enforcement of New York City's building codes by the City's Assistant Chief Inspector and other Department of Building ("DOB") employees because the amended complaint "only identifie[d] four instances in which the plaintiffs were alleged to have been unfairly sanctioned by DOB." *Hu*, 927 F.3d at 106. In doing so, the Second Circuit found critical that the amended complaint "did not allege how many DOB employees were involved in the scheme, whether these accomplices represented a large or small share of DOB inspectors or personnel, the frequency with which [they] assisted in discriminatory enforcement actions, or any other facts that might indicate the extent to which DOB personnel helped [the Assistant Chief Inspector] carry out" the challenged conduct. *Id.* The Second Circuit reasoned that this made it "entirely unclear whether" the challenged conduct was "the product of a few rogue officials, a department-wide effort, or something in between." *Id.*

Defendants argue that MacDonald's *Monell* claim must fail because he did not submit any evidence—outside of his own deposition testimony—to support the existence of any Suffolk County custom of subjecting Black people to pretextual *Terry* stops. In opposition, MacDonald contends that "there is no evidence to support the allegation that Defendant Officers had any probable cause to pull over Mr. MacDonald" and no evidence "to show that Mr. MacDonald ever committed a traffic infraction," and that Rieber is known by the nickname "Tattoo" and has a reputation for "shaking down, pulling over and tormenting the Black and Brown populations in the community." (Opp'n at 11.) He also argues that the County allows discriminatory *Terry* stops "to continue unabated and for officers face no discipline for conducting discriminatory stops," but he does not cite any facts in the record to support this proposition. (*Id.*)

MacDonald's experience of being subjected to a traffic stop by the Defendant Officers is the only instance in the factual record of an allegedly unlawful traffic stop. Accordingly, the

28

record does not give rise to a material question of fact as to whether racially motivated *Terry* stops are "an unwritten practice that is so *widespread* as to have the force of law" in Suffolk County. *Agosto*, 982 F.3d at 98 (emphasis added).

Moreover, Rieber's nickname does not shed any light on whether Suffolk County has a widespread practice of conducting racially discriminatory *Terry* stops, as it is undisputed that the nickname itself refers to the tattoos visible on Rieber's body. (*See* MacDonald Dep. at 18:13–14 ("The community refers to him as Tattoo. Apparently he has a sleeve, a tattoo sleeve."); Rieber Dep. at 10:6–15 (acknowledging that members of the community call him "Tattoo").) Further, as stated above, MacDonald's argument that Rieber is "known for shaking people down" is based on inadmissible hearsay from community members who have "expressed complaints about Officer Rieber" to MacDonald. *See* MacDonald Dep. at 26:17–21; *see Wekenmann*, 2025 WL 831201, at *3. But even if these hearsay statements were admissible, they still do not create a genuine dispute of material fact that *Suffolk County as a whole* has a widespread practice of conducting racially discriminatory *Terry* stops because they concern just a single officer's conduct. *See Jones*, 691 F.3d at 82 (holding that even six "unquestionabl[e] . . . instances of reprehensible and at times illegal and unconstitutional conduct by individual officers" is "not a sufficient basis for imposing liability on the municipality" on a custom theory).

During oral argument, MacDonald argued that the statements from community members are not hearsay because they are "not being offered for the truth of the matter asserted." (Tr. 27:24–28:3.) MacDonald has not identified an exception to the rule against hearsay that applies to MacDonald's recounting of community complaints about Rieber. Further, if the hearsay statements from community members regarding Rieber's reputation for biased policing are "not being offered for the truth of the matter asserted," as MacDonald asserted during oral argument,

29

then his *Monell* claim premised on the theory that Suffolk County has such a widespread and longstanding practice by which Black people are subjected to racially motivated *Terry* stops is still left without any factual support in the record.

MacDonald's argument that "no matter how many constitutional violations of the community Defendant [Rieber] commits, he has never been disciplined or retrained," thereby showing that the "County condones the discriminatory behavior of Defendant Rieber" is also without support. For this proposition, MacDonald relies upon paragraph 23 of the Counterstatement of Material Facts, which consists of citations to the Complaint and Rieber's deposition. But allegations in an unverified complaint are "not competent summary judgment evidence." *Millennium Tr. Co., LLC v. Tr. for Benefit of William E. Kassar III*, No. 23-cv-05094, 2025 WL 1017517, at *4 n.3 (E.D.N.Y. Apr. 4, 2025); *see also Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 132 (S.D.N.Y. 2023) ("It is blackletter law that an unverified complaint is not evidence that can be relied upon at summary judgment."). Additionally, MacDonald relies on Rieber's deposition testimony that he has never been disciplined by the County but does not identify evidence in the record showing that Rieber has engaged in a pattern of misconduct that warrants discipline. (CSMF ¶ 23; Rieber Dep. at 18:3–5.) To be sure, based on the Court's close review of the record, Rieber does recount that he was the subject of a Suffolk County Internal Affairs investigation in 2020 arising out of an allegation that he used excessive force on a protestor while making an arrest. (Rieber Dep. at 18:6– 24:7.) Additionally, although MacDonald does not cite to it, Michaels also recounted at least four civilian complaints filed against him dating back to 2014. (Michaels Dep. at 35:9–37:9, 42:20–46:4, 63:20–80:8.)

Nevertheless, a single investigation regarding Rieber and four civilian complaints against Michaels over twelve-year period are not sufficient to raise a genuine dispute of material fact as

to whether Suffolk County has a custom by which its police officers engage in racially discriminatory traffic stops that is so widespread and longstanding that it has become a de facto County policy. *See Jones*, 691 F.3d at 82. Therefore, Defendants' motion for summary judgment is granted on the equal protection claims against Suffolk County based on a custom theory.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 30) is granted in part and denied in part as follows. Defendants are denied summary judgment with respect to MacDonald's equal protection claims against the Defendant Officers under Section 1983 that are premised on a theory of intentional racial discrimination, specifically the alleged discriminatory application of a facially neutral law. However, summary judgment is granted to the Defendant Officers on MacDonald's equal protection claims under Section 1983 that are premised on a selective enforcement theory. Summary judgment is also granted to Suffolk County on MacDonald's equal protection claims for municipal liability under Section 1983 and *Monell*. Moreover, the Defendant Officers' motion for summary judgment on qualified immunity is denied as premature at this time.

Dated: Central Islip, New York
      May 22, 2026

                                */s/ Nusrat J. Choudhury*
                                NUSRAT J. CHOUDHURY
                                United States District Judge